**JENKINS MULLIGAN & GABRIEL L.L.P.**
Daniel J. Mulligan [SBN: 103129]
dan@jmglawoffices.com
Larry W. Gabriel [SBN: 68329]
lgabriel@jmglawoffices.com
Thomas A. Jenkins [SBN: 92213]
tom@jmglawoffices.com
660 Market Street, Third Floor
San Francisco CA 94104
Tel: (415) 982-8500
Fax: (415) 982-8515

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLETCHER HARTWELL HYLER and SHERYL ROOT HYLER,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>INVESTMENT GRADE LOANS, INC., et.al.,<br><br>　　　　　Defendants. | Case No.: 07-CV-03180 WHA<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |

## INTRODUCTION

Plaintiffs Fletcher Hartwell Hyler and Sheryl Root Hyler (hereinafter "Plaintiffs") hereby request that this Court restrain the sale of their home, now scheduled for July 18, 2007. Absent such an order, plaintiffs will lose their home, a unique property whose loss cannot be compensated for by monetary damages.

This application is based on the following facts:

1.　Plaintiffs arranged a loan, secured by their residence, with defendant Investment Grade Loans ("IGL") in early 2004. [Declaration of Fletcher Hyler, "Hyler Dec.", filed herewith, para. 2). The loan closed on or about February 19, 2004; the Hylers have lived in the home ever since. [Id.].

2. Due to business reversals, Mr. Hyler was compelled to file bankruptcy in October, 2004. The case was filed in the Northern District of California under Chapter 11 of the Bankruptcy Code. A trustee was appointed. [Id., para. 3].

3. The bankruptcy trustee initiated an action against defendant IGL on or about October 13, 2006, seeking rescission and damages against IGL for alleged violations of the Truth In Lending Act in connection with the loan made to plaintiffs. [Id., para. 4].

4. In 2007, the trustee decided to auction the claim against IGL. Plaintiffs participated in the auction and purchased the claim for $200,000. The Court approved the sale and then approved the abandonment of the home as property of the estate. In addition, by Order effective June 22, 2007, the Bankruptcy Court transferred this matter to this court, substituting the Hylers as plaintiffs in place of the trustee. [Id., paras. 5 -6].

5. Plaintiffs have actively been engaged in attempting to refinance the loan at issue. However, this proved impossible as long as the property was still in the bankruptcy estate. [Id. para.7]. Plaintiffs did not receive a Notice of Sale from IGL until June 29, 2007. [Id., para. 8].

6. Once the property was removed from the bankruptcy estate and this action had been transferred to this court, the efforts to refinance proceeded. Plaintiffs were advised that a complete refinance had been arranged, set to close and fund prior to the scheduled date of the trustee's sale, which is July 18, 2007. To help accomplish this refinance, without affecting the claims in this action, plaintiffs stipulated with IGL to allow IGL to be paid the principal balance of the loan out of the planned escrow, with the remainder of the funds being held in escrow until the completion of this action. That stipulation was filed with this court on July 12, 2007. [Id., para. 9].

7. Although plaintiffs were advised that the loan was set to close, the loan documents have not been presented as of this date. Plaintiffs have been advised that it may take 30 – 40 days to arrange a new loan if the current one does not go forward. [Id., paras. 10 – 12].

1    As a result, plaintiffs face the immediate loss of their home before this action can be
2  decided. The property, in addition to being the family home, is unique, in and of itself. It
3  sits on some 10 acres, just a short drive from Stanford University and is surrounded by
4  thousands of acres of dedicated land that cannot be developed. [Id., para. 13]. In short,
5  irreparable injury will result if this application is not granted.

## LEGAL DISCUSSION

8    A temporary restraining order is a provisional remedy designed to preserve the status
9  quo and prevent irreparable loss of rights prior to judgment. *Sierra On-Line, Inc. v. Phoenix*
10 *Software, Inc., 739 F.2d 1415, 1422 (9th Cir. 1984).* A party seeking temporary injunctive
11 relief under *Rule 65* bears the burden of showing either (1) a combination of probable
12 success on the merits and the possibility of irreparable harm, or (2) that serious questions are
13 raised and the balance of hardships tips sharply in the moving party's favor. *Walczak v. EPL*
14 *Prolong, Inc., 198 F.3d 725, 730-31 (9th Cir. 1999)*; *Rodeo Collection, Ltd. v. West Seventh,*
15 *812 F.2d 1215, 1217 (9th Cir. 1987).*

16   Here, each of these requirements is met. As noted, the potential harm is irreparable –
17 plaintiffs will lose their home. While certainly the dollar value of this loss can be
18 compensated, the home inherently is not replaceable. Indeed, beyond being the family home,
19 the property is absolutely unique. [See, Hyler Dec., para. 13].

20   As to the merits and the probability of success, such was completely analyzed by the
21 bankruptcy trustee. In the trustee's statement submitted in May 2006, stated flatly that the
22 IGL loan had violated provisions of the Truth In Lending Act. [Declaration of Daniel J.
23 Mulligan, filed herewith, Exhibit A]. The analysis used by the trustee, as relevant here, is set
24 forth in full, with only modifications for clarity of reference:

25   The Truth In Lending Act ("TILA ") is to be enforced strictly against creditors and
26 construed liberally in favor of consumers. *Farley v. Turan-Foley Imports, Inc.* 65 F3d 475
27 (5th Cir. 1995). It is a remedial statute. Section 1602(f) of the TILA defines the term
28 "creditor", insofar as relevant to the loan in question, as follows: "Any person who

originated 2 or more mortgages referred to in subsection (aa) of this section in any 12-month period *or any person who originates 1 or more such mortgage through a mortgage broker shall be considered to be a creditor for purposes of this subchapter."*15 U.S.C. §1602(f)1 (Emphasis added). In the instant case, the Lenders arranged the loan in question through a mortgage broker, and are thus considered to be "creditors" for purposes of the TILA. "Person" is defined in Section 1602(d) as "a natural person or an organization." Section 1602(c) defines "organization" as being "a corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association."

Section 1602(aa) provides as follows: A mortgage referred to in this subsection means a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if – (**A**) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or (**B**) the total points and fees payable by the consumer at or before closing will exceed the greater of –(**i**) 8 percent of the total loan amount; or (**ii**) $400. On December 15, 2003 the rate for 5 year Treasury securities was 3.26% and on January 15, 2004 the rate for 5 year Treasury securities was 2.97%. Thus, pursuant to the provisions of Section 1602(aa) (A) the annual percentage rate on the loan in question could not exceed 13.36% or 12.97%, depending upon when the application for the loan was received, in order for the loan to be exempt from the TILA. Furthermore, it appears that the total points and fees paid by the debtor amounted to approximately $126,250.00, which was approximately 11.0% of the total amount of the loan. Therefore, the total amount of points and fees exceed the 8% permitted by the provisions of Section 1602(aa) (B).

Section 1603(1) of the TILA does provide that "[t]his subchapter does not apply to the following: (1) Credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or

4

1 instrumentalities, or to organizations." However, it is Trustee's position, based upon the
2 information provided by the debtor as to the use of the loan proceeds, that the loan was NOT
3 obtained primarily for business, commercial, or agricultural purposes. The only possible
4 aspect of the loan that even arguably could be considered to be for business purposes was
5 that portion of the proceeds (i.e., $310,368.59) that was used to pay employment taxes
6 personally owed by the debtor as a result of business formerly operated by him, but which
7 was no longer operated by him at the time of the consummation of the loan. The amount of
8 the loan proceeds used to pay the debtor's employment tax obligation amounted to only
9 approximately 26% of the total loan proceeds. However, it is Trustee's position that even
10 that portion of the loan proceeds must be considered as being for personal use since the
11 debtor was personally obligated for the taxes in question, and he was no longer operating the
12 business that resulted in the tax obligation. However, even if the amount used to pay the
13 debtor's employment tax obligation were to be considered a business purpose, since
14 approximately 74% of the loan proceeds were clearly used for personal obligations, it is
15 Trustee's position that the loan in question is, in fact, subject to the provisions of the TILA.

16     An analysis of the Note demonstrates that the Note violates the TILA. Section
17 1639(d) of the TILA provides, in relevant part, that "[a] mortgage referred to in section
18 1602(aa) of this title may not provide for an interest rate applicable after default that is
19 higher than the interest that applies before default. . . ." In the instant case, the Note provides
20 that in the event of a default the interest rate increases by 3% over the non-default rate of
21 16%, *i.e.,* to 19%. Thus, the Note violates the provisions of Section 1629(d).

22     Section 1639(j) of the TILA, entitled "Consequences of failure to comply" provides
23 as follows: Any mortgage that contains a provision prohibited by this section shall
24 be deemed a failure to deliver the material disclosures required under this subchapter, for the
25 purpose of section 1635 of this title.

26     Section 1635(f) provides, in relevant part, that the obligor has three years from the
27 date of consummation of the transaction or upon the sale of the property, whichever occurs
28 first, within which to exercise the right to rescind the transaction. Section 1635(b) provides,

in relevant part, that when an obligor exercises his right to rescind "he is not liable for any finance or other charge, and any security interest given by the obligor . . .becomes void upon such a rescission. . . ." *See also,* Regulation Z § 226.15(d)(1) ("When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void, and the consumer shall not be liable for any amount, including any finance charge.")

As noted above, when a violation of the Truth IN Lending Act occurs, the borrower is entitled to rescind the transaction and the security interest is void. *15 U.S.C. 1635 (b).* This means that once a violation is established, the lender absolutely has no right to foreclose, since the lien on the property is void. However, this remedy would become worthless here, if the foreclosure is allowed to proceed. That bell cannot be unrung.

## CONCLUSION

For all of the above stated reasons, plaintiffs respectfully request that scheduled foreclosure sale be halted until such time as a full hearing can be held.

Respectfully submitted,

JENKINS MULLIGAN & GABRIEL, LLP

By: /s/ Daniel J. Mulligan