Michael E. Stone, State Bar No. 46016
Leo B. Siegel, State Bar No. 116841
LAW OFFICE OF MICHAEL E. STONE
3425 S. Bascom Avenue, Suite I
Campbell, California 95008
408/377-9899 Telephone
408/377-5270 Facsimile

Attorney for Defendants
Investment Grade Loans, Inc., et al

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLETCHER HARTWELL HYLER and SHERYL ROOT HYLER,<br><br>Plaintiffs,<br><br>vs.<br><br>INVESTMENT GRADE LOANS, INC., et al.<br><br>Defendants. | CASE NO.: 07-CV-03180 WHA<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO REQUEST FOR PRELIMINARY INJUNCTION<br><br>**Hearing Date: August 1, 2007<br>Time: 2:00 p.m.<br>Courtroom: 9<br>Judge: Hon. William H. Alsup** |

**INTRODUCTION**

What this Court is hearing now, in Plaintiff's application for a Preliminary Injunction, is nothing more than the same old story that the Plaintiffs have been spinning in the Bankruptcy Court for the last three years:

"Although plaintiffs were advised that the loan was set to close, the loan documents have not been presented as of this date. Plaintiffs have been advised that it may take 30-40 days to arrange a new loan if the current one does not go forward." (Plaintiffs Memorandum In Support, paragraph 7, page 2).

Memorandum of Points and Authorities In Opposition To Request For Preliminary Injunction

1    The credibility of this representation, however, has become nil, to the point where the
2 Bankruptcy Judge, the Hon. Thomas E. Carlson, stopped giving Plaintiffs any more "free time" to
3 arrange such financing, appointed a Trustee and ordered the sale of the subject property and
4 converted Plaintiff's Chapter 11 proceeding to a Chapter 7.  Even then, though, the property could
5 not be sold for enough money to satisfy all the obligations Plaintiffs owe against it, such that it was
6 eventually abandoned as an asset of the bankruptcy estate.  This is all a matter of public record in
7 Case No. 04-32952-TEC of the San Francisco Division of the Northern District of California, United
8 States Bankruptcy Court.

9    Yet, after over three years of not making any payments on the One Million Two Hundred
10 Thousand Dollars ($1,200,000) of Defendants' money, that they borrowed in February of 2004, such
11 that the obligation has now increased by approximately $600,000 in accrued unpaid interest, here
12 Plaintiffs are again, seeking more free time to arrange that new financing that is just "30 to 40 days"
13 away.

14    The equities are just not in Plaintiffs' favor.  Even if they were granted a rescission of
15 Defendants' loan ( a conclusion that is disputed, as further set out herein), they would still have to
16 return Defendants' principal plus, per cases cited further herein, a reasonable interest for use of the
17 money.  Meanwhile, Defendants' deed of trust is subordinate to 1) over $150,000 in defaulted
18 property taxes, and 2) a $4,205,700 first deed of trust that has been in default since March 30, 2004
19 (see title report attached to Declaration of Michael E. Stone, submitted herewith).

20    Based on Plaintiffs' history during the last three years that they have had the benefit of the
21 bankruptcy proceeding's automatic stay, there is little likelihood that they can or will obtain
22 refinancing sufficient to pay off even the undisputed portion of Defendants' loan, never mind the
23 additional $600,000 that has built up since they defaulted on payments (note: they made only the first
24 installment that became due under the loan, then defaulted and filed for bankruptcy protection).  If
25 this Court decides that Plaintiffs have met their burdens for obtaining a preliminary injunction
26 (discussed and disputed further herein), then at a minimum, Plaintiffs should be required to post a
27
28

Memorandum of Points and Authorities In Opposition To Request For Preliminary Injunction
2

1  bond sufficient to cover the undisputed $1,235,000 plus costs and reasonable interest.

**LEGAL ARGUMENT**

A. <u>Burdens on Plaintiffs</u>

A preliminary injunction is an extraordinary remedy which is not available unless plaintiffs carry their burden of showing that 1) they have a reasonable likelihood of succeeding on the merits; 2) they have no adequate remedy at law and will be irreparably harmed if an injunction does not issue; and 3) that the threatened injury to plaintiffs outweighs the harm that an injunction may inflict on defendants.        <u>Continental Group Inc. vs. Amoco Chem. Corp.</u> (1980 CA3 NJ) 614 F2d 351

In deciding whether or not to issue a preliminary injunction, the Court must balance the hardships; and where the plaintiffs showing of a likelihood of success on the merits is not that strong, they need to make a decidedly strong showing that the balancing of harms weighs in their favor.  <u>Inmates of Attica vs. Rockefeller</u> (1971, CA2 NY) 453 F.R. Serv. 2d 787

B. <u>Likelihood Of Success Is Not In Plaintiffs' Favor</u>

As Plaintiffs' Memorandum In Support acknowledges, under Section 1603(1) of the Truth In Lending Act (hereinafter "TILA"), transactions involving "extensions of credit primarily for business, commercial, or agricultural purposes" are exempted.  Plaintiffs argue, as the Bankruptcy Trustee before them did, that their actual use of the money was for personal purposes, not business, and that should control whether or not the transaction was exempt.  But that is not the law.  Why the credit was extended, not how it was eventually used, is what controls on the issue of an exempt business purpose transaction.

Under the Legislative Commentary on this issue, at Section 226.3-Exempt Transactions," subsection 3(a) states (with emphasis added in bold type):

> " 1. Primary purposes.  A creditor must determine in each case if the transaction is primarily for an exempt purpose.  If some question exists as to the primary purpose for a credit extension, the creditor is, of course, free to make the disclosures, and the fact that disclosures are made under such circumstances is not controlling on the question of whether the transaction was exempt.
>
> 2. Factors.  In determining whether credit to finance an

    acquisition-such as securities, antiques, or art-is primarily for business or commercial purposes (as opposed to a consumer purpose), the following factors should be considered:

- The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.
- The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.
- The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.
- **The size of the transaction. The larger the transaction, the more likely it is to be business purpose.**
- The borrower's statement of purpose for the loan.

Examples of business-purpose credit include:
- **A loan to expand a business, even if it is secured by the borrower's residence or personal property**
- A loan to improve a principal residence by putting in a business office
- A business account used accessional for consumer purposes

Examples of consumer-purpose credit include:
- Credit extensions by a company to its employees or agents if the loans are used for personal purposes
- A loan secured by a mechanic's tools to pay a child's tuition
- A personal account used occasionally for business purposes."

Investment Grade Loans, Inc. (hereinafter "IGL") does not make consumer loans. It is a hard money lender known in the area to make business and construction loans secured by real property. With the exception of Plaintiffs' loan, that real property is not the owner-occupied residences of the borrowers. It is apartment buildings, condominium developments, office buildings, and such.

In February of 2004, Plaintiffs' mortgage broker, a Gary Bowers, wrote to IGL seeking a $1,000,000 "bridge" loan for Plaintiff Fletcher Hyler "to get his business going again". A copy of that communication is attached to the declaration submitted herewith.

As the legislative commentary identifies and uses as an example of an exempt business purpose loan, exempted, Mr. Hyler was seeking "a loan to expand a business, even if it is secured by the borrower's residence". It was to be a loan of a million dollars or more, and the "size of the transaction" is one of the factors to be considered, with "the larger the transaction, the more likely

1  it is to be business purpose".

2  Mr. Hyler's business resume´ was supplied by him to his mortgage agent, and by said agent
3  to IGL (attached to the above-referenced Feb. 2004 correspondence from Bowers). Also supplied,
4  (and attached to the above) was Mr. Hyler's explanation and business plan regarding the loan. He
5  needed to cover expenses for "3 to 5 months" so he could "license some of (his) patented intellectual
6  property", and if his business expectations failed, then he would "sell the house in the fall of 2004".

7  Well, they did fail, and instead of selling the house and paying the IGL business purpose
8  loan, he filed a Chapter 11 bankruptcy "in the fall of 2004", lived in the property payment free for
9  three years, and now wants to escape all finance charges on the loan, because, he now asserts, it was
10 a consumer loan, not business purpose. And his assertion lacks credibility. The only loan
11 application documents received (the three pages discussed) state otherwise.

12 Morever, both in the bankruptcy proceedings and in a 2002 tax court case, <u>Fletcher H. Hyler</u>
13 <u>vs. Commissioner</u>, Docket No. 11023-OIL, T.C.MEMO 2002-321, 84 TCM717, Mr. Hyler has
14 consistently argued that his residence was part and parcel of his business. In the tax court, he argued
15 that this was why he applied available funds to his residence rather than to his tax liabilities. And
16 in the bankruptcy court he argued that he needed to retain the residence to "attract and develop
17 business relationships" and to "entertain noteworthy clients with its superior facilities" (quoted from
18 his Opposition To Motion For Relief From Automatic Stay filed Feb. 2, 2005, page 5 - - -
19 interestingly, in said opposition, he also represented to the court that if he could not get his "income
20 stream" re-established in six months, he would submit "a liquidation plan for selling property of such
21 high quality and value"; and neither occurred, not then and not now, over two years later).

22 And the import of all this? Once it is shown that the *purpose* (not "use") of the loan was
23 primarily business, under 15 U.S.C. §1603(1), the transaction was exempt and it did not matter
24 whether or not the note included a "default interest" provision (it should be noted here that this
25 provision is the sole basis for Plaintiffs' claim to rescission, dispute the fact that they have never
26 been charged nor have they paid any "default interest"; all the rest of the provisions of TILA were

27

28  Memorandum of Points and Authorities In Opposition To Request For Preliminary Injunction
5

satisfied, applicable or not, as the Hylers received and signed full Truth-In Lending disclosures and notice of right to cancel; they even exercised their cancellation right; see attachments to declaration submitted herewith). In other words, Plaintiffs have not and can not satisfy their burden of showing that there is a reasonable likelihood that they will prevail on the merits.

### C. Irreparable Injury Versus Adequate Remedy At Law

The only way that Plaintiffs suffer their "irreparable injury" (loss of the family home) is if they continue to fail to pay even the undisputed portion of the loan obtained from Defendants. By their own admissions, and upon their initiation, they have a Stipulation and Order filed herein whereby they will pay Defendants the $1,235,000 principal, and then impound the disputed portion (in excess of $600,000). That, it is submitted, **is** an adequate pende lite remedy, for both sides. However, true to form, they now want another "30 to 40 days" to obtain financing (that which they represented they already had, but apparently did not exist). And they want this Court to further delay the Defendants from pursuing collection, further accrue unpaid interest, and further build up the defaulted obligations that are senior to Defendants' deed of trust (i.e. further impair Defendants' security).

After three years of use of Defendants' $1,235,000 with no payments, the equities and balancing of hardships is no longer in Plaintiffs' favor. As the cliché goes, "it is time to put up or shut up". The harm that has been inflicted on Defendants' already (over $600,000 of unpaid interest over $150,000 in defaulted property taxes in front of Defendants security; and a $4,205,000 senior encumbrance in default since 2004) outweighs the perceived harm Plaintiffs are claiming should they continue to not pay Defendants and the property thereby goes to foreclosure sale. The Court should see Plaintiffs' case for what it is, not a "remedial" use of a law intended to be used as a shield for innocent consumers, but an attempt by a businessman to use TILA as a sword (seeking free use of money borrowed "to get his business going again"); and it should tell Mr. Hyler "Enough is enough; no more restraining orders; you have already had three year's worth, abused those, and are not going to be allowed to inflict more hardship on these defendants."

Memorandum of Points and Authorities In Opposition To Request For Preliminary Injunction

6

1  D. Bond Amount

2  Even where obligors prevail in TILA actions, equity allows a court to order tender of
3  principal and a reasonable interest as a condition of rescission. Rachbach vs. Cogswell (1976, 10th
4  Cir) 547 F.2d 502; Quenzer vs. Advanta Mortgage (2003) 288 B.R. 884. In considering Plaintiffs'
5  application herein to enjoin Defendants pending the outcome on their TILA action, this Court should
6  do no less.

7  Under Rule 65(c), no preliminary injunction shall be issued except upon posting of security
8  for costs and damages expected if the enjoined party ultimately prevails. Defendants submit that the
9  bond amount should be at least $1.5 million, to cover the undisputed principal amount plus a
10 reasonable interest (at just 10% per annum, the interest for three year would be $370,500).

11  E. Conclusion

12  While Defendants submit that no preliminary injunction should be issued, due to Plaintiffs'
13 failure to carry their burdens, if one is deemed appropriate, it should be conditioned upon the posting
14 of a mega-bond; one in an amount not less than $1.5 million.

15                                      Respectfully submitted,

16 Dated: July 24, 2007                 LAW OFFICE OF MICHAEL E. STONE

17

18                                      /s/ Michael E. Stone
                                        MICHAEL E. STONE, Attorney for
19                                      Defendants IGL, et al

20

21

22

23

24

25

26

27

28  Memorandum of Points and Authorities In Opposition To Request For Preliminary Injunction
                                        7