Fletcher Hartwell Hyler, in propria persona
Sheryl Root Hyler, in propria persona
3130 Alpine Road, Suite 288
Portola Valley, CA 94028
(650)234-8160
(650)234-8124 (fax)
budh@logmkt.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLETCHER HARTWELL HYLER AND SHERYL ROOT HYLER <br><br> Plaintiffs, <br><br> vs. <br><br> INVESTMENT GRADE LOANS, INC., ET AL., <br><br> Defendants. | Case No. 07-CV-03180 WHA <br><br> DECLARATION OF FLETCHER HARTWELL HYLER IN SUPPORT OF PLAINTIFFS' F.R.C.P. 60(b)(3) MOTION TO SET ASIDE JUDGMENT AND SETTLEMENT AGREEMENT FOR FRAUD, MISREPRESENTATION AND MISCONDUCT BY OPPOSING PARTY <br><br> DATE:  August 28, 2007 <br> TIME:  8:00 A.M. <br> DEPT.: 9 |

I, Fletcher Hartwell Hyler, hereby declare as follows:

1. I am one of the plaintiffs in the above-captioned action.

2. On March 3, 2004, my wife Sheryl S. Root-Hyler and I borrowed the sum of $1,232,500.00 (the "Loan Transaction") from the following defendants: (1) Lincoln Trust Company, Custodian FBO Doug Pickering, IRA as to an undivided 740/12325 interest, (2) Chern S. Lin and Felicia Lin, husband and wife as community property as to an undivided 3000/12325 interest, (3) Janice Tempey and Roy S. Wolf, husband and wife as community property as to an undivided 26.00/12325 interest, (4) Thomas C. O'Connell, Jr. and Janice K. O'Grady, husband and wife as community property as to an undivided 1235/12325 interest, (5)

1    Pensco Trust Company, Custodian FBO John A Snyder IRA, as to an undivided 750/12325

2    interest, (6) Pensco Trust Company, Custodian FBO Phil Ahlfeldt, IRA, as to an undivided

3    3000/12325 interest and (7) John Stevens, an unmarried man as to an undivided 1000/12325

4    interest (hereinafter collectively referred to as the "Lender Defendants").

5         3.  The Loan Transaction is evidenced by a Note Secured By A Deed Of Trust (the

6    "Note") dated February 19, 2004, and executed on February 20, 2004, a true and correct copy

7    of which is attached hereto as Exhibit "A". The Note is secured by the lien of a Deed of Trust

8    dated February 20, 2004, a true and correct copy of which is attached hereto as Exhibit "B".

9    This Deed of Trust was recorded on March 3, 3004 in the Official Records of San Mateo

10   County as Document No. 2004-038332.  This Deed of Trust constituted a lien against the

11   residential real property owned at the time by my wife and I, commonly known as 5070 Alpine

12   Road, Portola Valley, California 94028 (hereinafter the "Residence"), where we resided at all

13   times relevant hereto until February, 2008.

14        4.  The Loan Transaction was arranged by Defendant Investment Grade Loans, Inc.

15   ("IGL") acting as a mortgage broker on behalf of the Lender Defendants.  At all relevant times,

16   Andrew Lewis was the C.E.O. of IGL and its licensed broker.

17        5.  Section 3 of the Note provided for an interest rate of 16.0%, payable interest only

18   for a period of five (5) years, with a balloon payment due on April 1, 2009. Section 4 (A) of

19   the Note provided for a late charge of 10% of the amount of any overdue payment, and Section

20   4 (B) of the Note provided that in the event of a default the applicable interest rate shall be

21   "three (3%) in excess of the interest rate set forth in Section 3."

22        6.  The major non-closing costs proceeds from the Loan Transaction were used by my

23   wife and I as follows: (1) $320,536.07 was disbursed to First Bank and Trust to cure defaults

24   under the loan secured by the first deed of trust against the Residence, (2) $16,968.91 was

25   disbursed to the California Franchise Tax Board, (3) $624,789.08 was disbursed to the Internal

26

27   Revenue Service for payment of tax liens, (4) $85,995.53 was disbursed to the San Mateo

28   County Tax Collector for payment of real property taxes secured by the Residence, (5)

$16,433,49 was disbursed to Defendant IGL for the account of the Lender Defendants on account of interest from March 2, 2004 to April 1, 2004, (6) $86,275.00 was disbursed to Defendant IGL for a mortgage broker loan fee, (7) $3,000.00 was disbursed to Defendant IGL for document preparation, (8) $36,975.00 was disbursed to The Bowers Group for a loan fee, (9) $38,202.01 was disbursed to the Hylers, and (10) $3,175.00 was disbursed to Chicago Title Company for miscellaneous closing costs, all as more fully set forth in the BUYER'S/BORROWER'S SETTLEMENT STATEMENT dated March 3, 2004, a true and correct copy of which is attached hereto as Exhibit "C."

7. Of the sum of $624,789.089 disbursed to the Internal Revenue Service, the sum of approximately of $310,368.59 was due from me for a trust fund penalty for employment taxes owed, and for which I was personally liable, and the balance of this sum was due to the Internal Revenue Service from me for personal income taxes I owed.

8. The Loan Transaction proceeds in the sum of $38,202.01 that were disbursed to wife and I were used by us for personal expenses.

9. Shortly after agreeing upon the above-mentioned loan transaction, it became apparent to my wife and I that we would require additional funds to cure our debts, and we requested that an additional $100,000.00 be tacked on to the loan. Rather than doing so, but acting on the same loan application, the Lender Defendants made a separate $100,000.00 loan to us, which later became the subject of an investigation by the California Department of Real Estate ("DRE"), as more fully described below.

10. Due to business reversals (*i.e.*, the "dot com bust" and its fallout), my personal income was adversely affected, and my wife and I defaulted on both of these loans shortly after

1   they were made.

2       11.  I was compelled to file bankruptcy in October, 2004. The case was filed in the

3
4   Northern District of California under Chapter 11 of the Bankruptcy Code. A trustee was

5   appointed.

6       12.  On September 22, 2006, the bankruptcy trustee's attorney, Terrance Stinnett, Esq.,

7   sent a letter to Michael Stone, Esq., attorney for the Lender Defendants, rescinding the above-

8
9   referenced $1,232,500.00 Loan Transaction for violation of the Federal Truth in Lending Act

10  (TILA), 15 U.S.C. § 1601 *et seq.* and copied me on the letter, a true and correct copy of which

11  is attached hereto as Exhibit "D."  The bankruptcy trustee initiated an action against Defendants

12  on or about October 13, 2006, seeking rescission and damages against them for TILA violations.

13
14      13.  In 2007, the trustee decided to auction the claim against IGL.  My wife and I

15  participated in the auction and purchased the claim for $200,000.00.  The Court approved the sale

16  and then approved the abandonment of the home as property of the estate.  By Order effective

17  June 22, 2007, the Bankruptcy Court transferred this matter to this court, substituting my wife

18
19  and I as Plaintiffs in place of the trustee.

20      14.  Throughout this time, my wife and I were actively engaged in attempting to refinance

21  the loan at issue. However, this proved impossible as long as the property was still in the

22  bankruptcy estate. We did not receive a Notice of Sale from IGL until June 29, 2007.

23
24      15.  Once the property was removed from the bankruptcy estate and this action had been

25  transferred to this court, our efforts to refinance our Residence proceeded. At one point, we were

26  advised that a complete refinance had been arranged, set to close and fund prior to the scheduled

27  date of the trustee's sale, which was July 18, 2007. To help accomplish this refinance, without

28

1    affecting the claims in this action, my wife and I (through our attorney) stipulated with IGL to

2    allow IGL to be paid the principal balance of the loan out of the planned escrow, with the

3

4    remainder of the funds being held in escrow until the completion of this action. That stipulation

5    was filed with this court on July 12, 2007.

6         16.  Although we had been advised that the loan was set to close, as of July 16, 2007, due

7    to changes in the credit industry the loan documents had not been presented. We had been advised

8

9    that it might take 30 – 40 days to arrange a new loan if the loan under consideration as of July

10   16, 2007 did not go forward.  (The market for second mortgages was deteriorating rapidly

11   during this time frame.)  Under pressure from the looming date for selling our house at

12   foreclosure, on July 16, 2007, our attorney brought an Ex Parte Application for a Temporary

13

14   Protective Order ("TPO Application").  On August 1, 2007, this Court issued an Order

15   granting the TPO, upon the following conditions:

16        First, plaintiffs must post a bond in the amount of $835,000 no later than
17        AUGUST 15, 2007, AT NOON (which amount plaintiffs concede is due no
          matter what and which will be posted by such date). Alternatively, said amount
18        of cash may be paid by defendants no later than AUGUST 15, 2007, AT NOON.

19        Second, plaintiffs' counsel must file a motion for summary judgment to be heard on
20        OCTOBER 11, 2007, AT 8:00 A.M., with a cross-motion to be filed by
          defendants, all on the schedule discussed at the hearing....
21

22        If either of these two conditions are not met, defendants are  free to sell the
          property under the power of sale without
23        further order of the Court.

24   Order Granting Temporary Restraining Order, pp. 1:23-2:4.

25        17.  In a letter to our attorney Edward Simpson, Esq. dated April 12, 2006, a true and
26

27   correct copy of which is attached hereto as Exhibit "E", Defendants' attorney represented that

28   the subject loan was a business loan to which TILA did/does not apply:

HYLER DECL. IN SUPPORT OF PLAINTIFF'S F.R.C.P                                    Page 5
60(b)(3) MOTION TO SET ASIDE JUDGMENT ETC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Next, you should do more research on the Truth in Lending Act, as it neither applies to "arrangers of credit" (as IGL was) nor to business loans such as Mr. Hyler made *[sic]* ....

18. My wife and I were unable to fund the $835,000.00 bond. On August 16, 2007, a foreclosure sale was conducted, at which the Lender Defendants bid in the alleged debt owed by Plaintiffs, and purchased the Hyler Residence. (According to appraisals performed in March and April, 2007, the Hyler Residence was worth $11,000,000; the loan secured by a first deed of trust on the property was for $4,000,000.00.)

19. I made a practice of reviewing the pleadings submitted by Defendants in the Bankruptcy Proceeding and in this case at or about the time they were filed and served. Thus, I was aware that the Defendants were taking the position that the loan which was the subject of this litigation was for business rather than personal purposes, and that that was the basis of Defendants' opposition to our TILA claim. I knew they had taken that position in their Answer to the complaint in the Bankruptcy Proceeding, and also in their Opposition filed in response to our motion for a Temporary Protective Order. I knew they had made the representation and testified that they did not make personal loans, only business loans.

20. Immediately after the Defendants purchased our Residence at the foreclosure sale, my wife and I remained in possession of the Residence. As to this case, we were forced to contemplate the possibility that the Court might believe Defendants regarding their asserted understanding that the loan was made for a business purpose loan; and the apparent fact (which we later discovered to be false) that the Defendants themselves believed they had made the subject loan for business purposes.

21. Immediately after purchasing our Residence at the foreclosure sale, Defendants

HYLER DECL. IN SUPPORT OF PLAINTIFF'S F.R.C.P
60(b)(3) MOTION TO SET ASIDE JUDGMENT ETC.

Page 6

explicitly threatened to immediately evict us from the Residence unless we settled on their terms while we tried to refinance the loan.   Under explicit threat of immediate eviction unless we agreed to settle on Defendants' terms, and confronted with the representations and testimony of Defendants' counsel regarding their asserted understanding that the loan was made for business purposes, on August 31, 2007, we capitulated and agreed to the terms insisted upon by Defendants in a Compromise, Settlement and Mutual Release Agreement ("Agreement"), a true and correct copy of which is attached hereto as Exhibit "F."  (This Agreement ultimately was signed by all of the parties for whom signature lines were provided on the Exhibit.)  Pursuant to this Agreement, we agreed to pay Defendants $200,000.00 for a 60 day option to repurchase our home for the sum of $2.1 million (still subject to the first deed of trust on the property), **or alternatively, to have the Trustee's sale rescinded and pay off the Lender Defendants' existing loans for $2.1 million** (a sum which included all principal, all accrued interest charges, attorneys' fees and costs).  We further agreed to dismiss this action, and agreed upon a mutual release and covenant not to sue.

22.  Pursuant to this Settlement Agreement, we (my wife and I) paid $100,000.00 of the consideration for the option grant and stipulated to an Order Dismissing [this] Action, which was entered on September 6, 2007.   We did not ultimately exercise the option, however, again due to problems with obtaining replacement financing.  The Lender Defendants initiated an unlawful detainer action, and ultimately evicted us from our home in February, 2008.

23.  Substantially after executing the Settlement Agreement, I learned that in a Stipulation and Agreement dated July 11, 2007, before the California Department of Real Estate, Andrew Lewis, the officer in charge of IGL, admitted that the $100,000.00 loan made

HYLER DECL. IN SUPPORT OF PLAINTIFF'S F.R.C.P
60(b)(3) MOTION TO SET ASIDE JUDGMENT ETC.

Page 7

to us (and consequently the subject $1,232,500.00 made pursuant to the same loan application) was a consumer loan rather than a business loan.

24. Had I known the true facts (that Mr. Andrews conceded the loan was a consumer loan and not a business loan), I would not have executed the Settlement Agreement or stipulated to the Order Dismissing [this] Action, but rather I would have pursued this litigation to a successful conclusion which would have resulted in a finding of wrongful foreclosure by the Defendants.

25. My wife and I opposed Defendants' unlawful detainer proceeding in San Mateo Superior Court case no. CLJ 195919 but were evicted in February, 2008. That case is on appeal to the Superior Court. Throughout the last couple of years, my income situation has been improving to close to where it was before the "dot com bust" and I have been attempting to obtain the financing necessary to repurchase their home, or if appropriate, upon return of title to me, refinance our existing lawful loans.

I swear and affirm the foregoing is true and correct under penalty of perjury pursuant to the laws of the State of California.

Dated:  7/22/08

Fletcher Hyler
Fletcher Hartwell Hyler

EXHIBIT A

# NOTE SECURED BY A DEED OF TRUST

Loan No : 0402022                                   Date : February 19, 2004,    LOS ALTOS, Californi

5070 Alpine Road, Portola Valley, CA 94028 - Property Address

### 1.  BORROWER'S PROMISE TO PAY

In Return for a loan that I have received, I promise to pay U.S. One million Two hundred Thirty-Two thousand Five hundred exactl ($1,232,500.00) (this amount will be called "principal"), plus interest, to the order of See Exhibit "B", (who will be called "Lender"). I understand that the Lender may transfer this Note.  The Lender or anyone else who takes this Note by transfer and who is entitled t receive payments under this Note will be called the "Note Holder."

### 2.  INTEREST

I will pay interest at a yearly rate as described in Section 3 below.
Interest will be charged on unpaid principal until the full amount of principal has been paid.
I also agree to pay interest at the rate described in Section 3 below on the prepaid finance charges which are a part of the principal.

### 3.  PAYMENTS

My payments are XX Interest Only  Fully Amortized  Other
I will make payments each month as follows:

CERTIFIED TO BE A TRUE
AND CORRECT COPY
CHICAGO TITLE INSURANCE CO.

BY

| Number of Payments | Payment Start Date | Interest Rates | Payment Amounts |
|---|---|---|---|
| 60 | April 1, 2004 | 16.000% | $16,433.33 |
| 1 | April 1, 2009 | 16.00  % | $1,248,933.33 |
|  |  | % | $ |
|  |  | % | $ |
|  |  | % | $ |
|  |  | % | $ |

I will make these payments until I have paid all of the principal and interest and any other charges I may owe under this Note. I on April 1, 2009 (the Due Date) I still owe amounts under this Note (balloon balance), I will pay all those amounts, in full, on that date.
I will make my payments payable to INVESTMENT GRADE LOANS, INC. 289 S. SAN ANTONIO ROAD #202 LOS ALTO; CA 94022 or at a different place if I am notified by the Note Holder or the Agent for the Note Holder.

### 4.  BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge of Overdue Payments  If I do not pay the full amount of each monthly payment by the end of 10 calendar day after the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be 10.00% of my overdue payment c U.S. $5.00, which ever is more.  I will pay this late charge only once on any late payment.
In the event a balloon payment is delinquent more than 10 days after the date it is due, I agree to pay a late charge in an amount equ to the maximum late charge that could have been assessed with respect to the largest single monthly installment previously due, othe than the balloon payment, multiplied by the sum of one plus the number of months occurring since the late payment charge began t accrue.

(B) Default

If I do not pay the full amount of each monthly payment due under this Note by the date stated in Section 3 above, I will be i default, and the Note Holder may demand that I pay immediately all amounts that I owe under this Note.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Not Holder will still have the right to do so if I am in default at a later time.  In the event I am in default I agree to pay interest at the rat of three (3%) percent in excess of the interest rate set forth in Section 3. A default of any obligation of Borrower to Lender sha constitute a default in all obligations of Borrower to Lender.

(C) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid bac for all its costs and expenses to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable attorney fees.  A default upon any interest of any Note Holder shall be a default upon all interests.

### 5.  BORROWER'S PAYMENTS BEFORE THEY ARE DUE - PREPAYMENT PENALTIES

I have the right to make payments of principal at any time before they are due.  A payment of principal only is known : "prepayment."  If I pay all the loan principal before it is due, whether such payment is made voluntarily or involuntarily, I agree to pay prepayment penalty computed as follows:  Security Instrument describes how and under what conditions I may be required to mak immediate payment in full of all amounts that I owe under this Note.

Some of those conditions are described as follows: There is no Prepayment Penalty.  Loan can be prepaid or fully repaid at any time

### 6.  BORROWER'S WAIVERS

I waive my rights to require the Note Holder to do certain things.  Those things are: (a) to demand payment of amounts due (know as "presentment"); (b) to give notice that amounts due have not been paid (known as "notice of dishonor"); (c) to obtain an offici certification of nonpayment (known as "protest").  Anyone else who agrees to keep the promises made in this Note, or who agrees  make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else, als waives these rights. These persons are known as "guarantors, sureties and endorsers."

**EXHIBIT "A"**

## 7. RESPONSIBILITY OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to keep all of the promises made in this including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to d these thing. Any person who takes over these obligations, including the obligations of the guarantor, surety, or endorser of this Note, i also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each perso individually or against all of us together. This means that anyone of us may be required to pay all of the amounts owed under this Note.

## 8. THIS NOTE IS SECURED BY A DEED OF TRUST

In addition to the protection given to the Note Holder under this Note, a Deed of Trust (the "Security Instrument") with a Due-on Transfer Clause dated the same date of this Note, protects the Note Holder from possible losses which might result if I do not keep th promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to mak immediate payment in full of all amounts that I owe under this Note.

Some of those conditions are described as follows:

"Lender's Right to Require The Loan to be Paid Off Immediately. If the borrower shall sell, enter into a contract of sale, lease for term of more than 6-years (including options to renew), lease with an option to purchase for any term, or transfer all or part of th Property or an interest therein, excludung (a) the creation of a lien or encumbrance subordinate to this Deed of Trust, (b) or a transfer b devise, descent, or by operation of law upon the death of a joint tenant, the Lender may, at its option declare the Note and any othe obligations secured by this Deed of Trust, together with accrued interest thereon, immediately due and payable, in full. No waiver of th Lender's right to accelerate shall be effective unless it is in writing."

_Fletcher H. Hyler_                                                          6/1/04
Fletcher H. Hyler - Borrower                                                    Dat

_Sheryl S. Root-Hyler_  by F.H. Hyler  Attorney in Fact                       2/6/04
Sheryl S. Root-Hyler - Borrower                                                 Dat

- Borrower                                                                      Dat

- Borrower                                                                      Dat

SPECIAL NOTICE TO ASSIGNEES REGARDING THIS MORTGAGE
Notice: This is a mortgage subject to special rules under the federal Truth in Lending Act. Purchasers or assignees of this mortgage could be liable for all claims and defenses with respect to the mortgage that the borrower could assert against the creditor

## ASSIGNMENT OF NOTE
## SECURED BY A DEED OF TRUST

Date:

FOR    VALUE    RECEIVED,    the    undersigned    hereby    grants,    assigns    and    transfers    t , all beneficial interest under the within Note, without recourse, and Deed of Trust securing same.

DO NOT DESTROY THIS NOTE: When paid it must be surrendered to the Trustee, together with the Deed of Trust securing same fc cancellation, before reconveyance will be made.

532-NOTE.DOC

# EXHIBIT "B"

### TO NOTE SECURED BY A DEED OF TRUST DATED FEBRUARY 19, 2004 TO
### FLETCHER H. HYLER AND SHERYL S. ROOT-HYLER
### IN THE AMOUNT OF $1,232,500.00 IN FAVOR OF THE FOLLOWING
### BENEFICIARIES:

Lincoln Trust Company, Custodian FBO Doug Pickering, IRA as to an undivided 740/12325 interest,

Chern S. Lin and Felicia Lin, husband and wife as community property as to an undivided 3000/12325 interest,

Janice Tempey and Roy S. Wolf, husband and wife as community property as to an undivided 2600/12325 interest,

Thomas C. O'Connell, Jr. and Janice K. O'Grady, husband and wife as community property as to an undivided 1235/12325 interest,

Pensco Trust Company, Custodian FBO John A. Snyder IRA, as to an undivided 750/12325 Interest,

Pensco Trust Company, Custodian FBO Phil Ahlfeldt, IRA, as to an undivided 3000/12325 interest

John Stevens, an unmarried man as to an undivided 1000/12325 interest.

EXHIBIT B

RECORDING REQUESTED BY 03180-WHA     Document 1-2     Filed 06/15/2007     Page 6 of 32

WHEN RECORDED MAIL TO

INVESTMENT GRADE LOANS, INC.
289 S. SAN ANTONIO ROAD #202
LOS ALTOS, CA 94022

**2004-038332**

CHICAGO TITLE INSURANCE COMPANY
08:00am 03/03/04 DT Fee: 40.00
Count of pages 12
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*  2  0  0  4  0  0  3  8  3  3  2  A  R  *

RECORDER: INDEX FOR SPECIAL NOTICE

# DEED OF TRUST

12*p.*

Loan No. 0402022

This Deed of Trust ("Security Instrument"), made this date February 19, 2004. Trustor is Fletcher H. Hyler and Sheryl S. Root-Hyler, husband and wife, as community property ("Borrower"). The Trustee Investment Grade Loans, ("Trustee"). The Beneficiary, See Exhibit "B", whose address is 289 S. SAN ANTONIO ROAD #202, LOS ALTOS, CA 94022 ("Lender").

**BORROWER,** owes Lender the principle sum of which (U.S. $1,232,500.00).

This debt is evidenced by Borrower's note dated the same as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable on April 1, 2009. This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in San Mateo County, California: which has the address of : 5070 Alpine Road, Portola Valley, CA 94028 ("Property Address"); Legal Description: See Exhibit A ; APN #: 076-350-220

**TOGETHER WITH** all the improvements now or hereafter erected on the property, and all easements, appurtenances, and all fixtures now or hereafter to the property. All replacements and additions shall be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property";

**BORROWER COVENANTS** that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property, that the Property is unencumbered except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

## BORROWER AND LENDER COVENANT AND AGREE AS FOLLOWS:

**1. Payments of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due, the principal of and interest on the debt evidenced by the Note, prepayment and late charges as provided in the Note.

**2. Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by the Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold or payments of ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items". Lender may, at any time, collect and hold Funds in any amount not to exceed the maximum amount a lender for a federally related loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. -2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time , collect and hold Funds due on the basis of current data and reasonable estimates of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be require to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Fund was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amount permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

# EXHIBIT "B"

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 21, Lend   hall acquire or sell the Property, Lender, prior   he acquisition or sale of the Property, shall apply any Funds held by Lender at the tin   of acquisition or sale as a credit against the sum   cured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. this insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by; Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewal shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or material impairment of the lien created by this Security Instrument or false inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7. **Protection of Lender's Rights in the Property.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value or the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instruments, appearing in court, paying reasonable attorney's fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from Lender to Borrower requesting payment.

8. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept,

Page 2 of 6

use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taken of any part or the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount to the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which set maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notice. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred ( or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. Borrower's Right to Reinstate. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for

reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. The conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default or any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonable require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. Sale of Note; Change of Loan Servicer. The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity ( known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law.

20. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of and Hazardous substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property on small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

## BORROWER AND LENDER FURTHER COVENANT AND AGREE AS FOLLOWS:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default to any other defense of borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sale. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Borrower and to the other person prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the time required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser a Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or Persons shall pay any recordation costs.

23. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereinabove by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

Page 4 of 6

24. Request for Notices. Borrower requests that copies of the notices of default and of sale be sent to Borrower's address which is the Property Address.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by law for furnishing the statement of obligation as provided by section 2943 of the Civil Code of California.

26. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

| | | |
|---|---|---|
| __XX__ 1-4 Family Rider | ___ Condominium Rider | ____ Planned Unit Development Rider |
| __XX__ Security Rider | Other(s) specify: | |

## REQUEST FOR SPECIAL NOTICE OF DEFAULT AND FORECLOSURE UNDER SUPERIOR MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed or trust or other encumbrance with a lien which has priority over this Security Instrument to Notice Lender care of Lender's Servicing Agent, at its address set forth on page one of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants of contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_Fletcht H. Hyler_ _____     2/20/04
Fletcher H. Hyler  - Borrower                                                Dated

_Sheryl S. Root-Hyler  by F.H.Hyler  Attorney in fact_     2/20/04
Sheryl S. Root-Hyler  - Co-Borrower                                        Dated

STATE OF CALIFORNIA  San Mateo County ss.
On _February 20, 2004_ before me, the undersigned, a Notary Public in and for said State, personally appeared
_Fletcher H Hyler_
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledge to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted. executed the instrument.
WITNESS my hand and official seal.

_signature_ _____          Dated _____
Notary's Signature

Name (typed or printed) _Sharon E. Lafountain_

My Commission Expires _3/31/07_

SHARON E. LA FOUNTAIN
Commission # 1403418
Notary Public - California
Santa Clara County
My Comm. Expires Mar 31, 2007

(This area for official notarial seal)

# REQUEST FOR FULL RECONVEYANCE

TO TRUSTEE:

The undersigned is the holder of the note or notes secured by this Deed of Trust. Said note or notes, together with all other indebtedness secured by this Security Instrument, have been paid in full. You are hereby directed to cancel said note or notes and this Security Instrument, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Security Instrument to the person or persons legally entitled thereto.

Dated:


("Lender")


When recorded, mail to INVESTMENT GRADE LOANS, INC., 289 S. SAN ANTONIO ROAD #202, LOS ALTOS, CA 94022


Att: Recon department

K_DEED.DOC

# ILLEGIBLE NOTARY SEAL DECLARATION

## (GOVERNMENT CODE 27361.7)

I declare under the penalty of perjury that the notary seal on the document to which this statement is attached, reads as follows:

NAME OF NOTARY PUBLIC: Sharon E. La Fountain

COMMISION NUMBER: 1403418

NOTARY PUBLIC STATE: California

COUNTY: Santa Clara

MY COMM. EXPIRES: 3-31-07

SIGNATURE OF DECLARANT:

PRINT NAME OF DECLARANT: Amy Anderson

CITY & STATE OF DECLARATION: Walnut Creek, California

DATE SIGNED: 3-1-04

THE ABOVE INFORMATION MUST BE LEGIBLE FOR SCANNING

Order No. 238092 - TO1                   **LEGAL DESCRIPTION**
                                          **EXHIBIT / SCHEDULE "A"**

## LEGAL DESCRIPTION

TOWN OF PORTOLA VALLEY

PARCEL I:

PORTION OF PARCEL "B", AS SHOWN ON THAT CERTAIN PARCEL MAP FILED AUGUST 2, 1971, IN
VOLUME 13 OF PARCEL MAPS, AT PAGE 19, SAN MATEO COUNTY RECORDS, MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF THE AFOREMENTIONED PARCEL B; THENCE FROM
SAID POINT OF BEGINNING, ALONG THE NORTHERLY LINE OF PARCEL "B", NORTH 32° 39' 40"
EAST, 169.18 FEET; NORTH 63° 28' 20" EAST, 422.00 FEET; AND NORTH 83° 40' 15" EAST,
98.68 FEET TO THE MOST WESTERLY CORNER OF PARCEL "C", AS SHOWN UPON SAID PARCEL
MAP; THENCE ALONG THE WESTERLY LINE OF PARCEL "C", SOUTH 23° 50' 10" EAST, 209.71
FEET; THENCE LEAVING SAID LINE OF PARCEL "C", SOUTH 16° 16' 56" EAST, 323.30 FEET
AND SOUTH 48° 04' 42" EAST, 337.97 FEET TO AN ANGLE POINT IN THE GENERALLY
SOUTHERLY LINE OF THE AFOREMENTIONED PARCEL "B"; THENCE ALONG SAID GENERALLY
SOUTHERLY LINE, SOUTH 73° 50' 55" WEST, 211.36 FEET; SOUTH 50° 33' 15" WEST, 249.89
FEET; NORTH 5° 25' 25" WEST, 270.58 FEET AND NORTH 59° 42' 03" WEST, 662.77 FEET TO
THE POINT OF BEGINNING; AND BEING A PORTION OF PARCEL "A" OF MAP ENTITLED,
"RESUBDIVISION OF PARCELS B & C OF PARCEL MAP RECORDED IN VOLUME 13 OF PARCEL MAPS,
AT PAGE 19, WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SAN
MATEO, STATE OF CALIFORNIA, ON DECEMBER 10, 1974, IN BOOK 26 OF PARCEL MAPS, PAGE
46.

PARCEL II:

ALL THOSE CERTAIN RIGHTS AND EASEMENTS AS SET FORTH IN THE FOLLOWING DEEDS:

(A)    DEED FROM CORTE MADERA, A LIMITED PARTNERSHIP, TO THE HEIRS OR DEVISEES OF
       JOHN FRANCIS NAYLAN, DECEASED, RECORDED APRIL 9, 1968, IN BOOK 5456 OF
       OFFICIAL RECORDS, AT PAGE 529 (33374-AB), RECORDS OF SAN MATEO COUNTY,
       CALIFORNIA.

(B)    DEED FROM RANCHO CORTE MADERA, A LIMITED PARTNERSHIP, TO EDGAR B. FILION, ET
       UX, RECORDED SEPTEMBER 14, 1971, IN BOOK 6013 OF OFFICIAL RECORDS, AT PAGE
       124 (FILE NO. 45427-AE), RECORDS OF SAN MATEO COUNTY, CALIFORNIA.

(C)    DEED FROM EDGAR B. FILION, ET UX, TO ROBERT GARY OWSLEY, RECORDED DECEMBER 9,
       1974, IN BOOK 6748 OF OFFICIAL RECORDS, AT PAGE 545 (FILE NO. 6457-AI),
       RECORDS OF SAN MATEO COUNTY, CALIFORNIA.

ASSESSOR'S PARCEL NO. 076-350-220     JOINT PLANT NO. 076-035-350-19A

EXHIBIT C



CHICAGO TITLE COMPANY

BUYER'S/BORROWER'S SETTLEMENT STATEMENT                    PAGE: 01

ESCROW NUMBER: 02970-000999799-001       ORDER NUMBER: 02970-000999799

CLOSING DATE:   03/03/04          CLOSER: Sharon LaFountain

BUYER:          Fletcher H. Hyler and Sheryl S. Root-Hyler

SELLER:

PROPERTY:       5070 Alpine Road, Portola Valley, California 94028

|  | CHARGE BUYER | CREDIT BUYER |
|---|---|---|
| Payoff Existing Loan With First Bank & Trust | | |
| Late Charge | 14,763.20 | |
| Statement Fee | 30.00 | |
| Foreclosure Fees | 10,478.63 | |
| 7 Monthly Payments to bring current | 258,356.21 | |
| March 1 Payment | 36,908.03 | |
| Payoff Existing Loan With Franchise Tax Board | 16,968.91 | |
| New Loan From Investment Grade Loans, Inc. | | 1,232,500.00 |
| Loan Charges To Investment Grade Loans, Inc. | | |
| Interest from 03/02/04 to 04/01/04 @ $   547.7800/day | 16,433.40 | |
| Loan Fee to Investment Grade Mortgage | 86,275.00 | |
| Loan Fee to The Bowers Group | 36,975.00 | |
| Document Preparation Fee to Investment Grade Mortgage | 3,000.00 | |
| Settlement or Closing Fee To Chicago Title Company | 750.00 | |
| Notary Fees To Notary Public | 30.00 | |
| Title Insurance To Chicago Title Company | 2,300.00 | |
| Delivery Fees to Outside Couriers | 25.00 | |
| Recording Fees | 70.00 | |
| APN: 076-350-220, 1st 1/2 2003/04 Taxes to San Mateo Count | 26,006.02 | |
| APN: 076-350-220, Tax Default to San Mateo County Tax Coll | 59,989.51 | |
| Payment of Tax Liens to Internal Revenue Service | 624,789.08 | |
| Hold for Recording of Releases to Come | 150.00 | |
| Funds Due To Buyer At Closing | 38,202.01 | |

TOTALS                                    $  1,232,500.00 $  1,232,500.00

**EXHIBIT "C"**

EXHIBIT D

LAW OFFICES
**GOLDBERG, STINNETT, MEYERS & DAVIS**
A PROFESSIONAL CORPORATION
44 MONTGOMERY STREET, SUITE 2900
SAN FRANCISCO, CALIFORNIA 94104

LAWRENCE GOLDBERG
TERRANCE L. STINNETT
MERLE C. MEYERS
DENNIS D. DAVIS
DANIEL M. LINCHEY
KATHERINE D. RAY
MIRIAM KHATIBLOU
KATHY L. QUON
YOSHIE VALADEZ
ANN E. SOTER

TELEPHONE
(415) 362-5045

FACSIMILE
(415) 362-2392

tstinnett@gsmdlaw.com

September 22, 2006

Michael E. Stone, Esq.
Law Offices of Michael E. Stone
3425 S. Bascom Ave., Suite I
Campbell, CA  95008

Investment Grade Loans, Inc.
289 S. San Antonio Road #202
Los Altos, CA 94022

    Re:    Fletcher Hartwell Hyler, Debtor, Case No. 04-32952-TEC
           Loan No. 0402022

Gentlemen:

    As you know, our office represents Andrea A. Wirum, trustee of the Chapter 11 estate of Fletcher Hartwell Hyler in Mr. Hyler's Chapter 11 case now pending in the United States Bankruptcy Court for the Northern District of California, San Francisco Division. This letter is being sent to Mr. Stone as the attorney for (1) Lincoln Trust Company, Custodian FBO Doug Pickering, IRA, (2) Chern S. Lin and Felicia Lin, (3) Janice Tempey and Roy S. Wolf, husband and wife, (4) Thomas C. O'Connell, Jr. and Janice K. O'Grady, husband and wife, (5) Pensco Trust Company, Custodian FBO John A Snyder IRA, (6) Pensco Trust Company, Custodian FBO Phil Ahlfeldt, IRA, and (7) John Stevens (hereinafter collectively referred to as the "Lenders") and (8) Investment Grade Loans, Inc. ("IGL"). This letter is being sent directly to IGL pursuant to the instructions contained in the Notice To Customers Required By Federal Law Notice Of Right To Cancel – General that was provided to Mr. Hyler in connection with the above-reference loan.

    On or about March 3, 2004, prior to the date that Mr. Hyler filed his petition for relief under the provisions of Chapter 11 of the United States Bankruptcy Code, Mr. Hyler and his wife, Sheryl S. Root-Hyler, obtained a loan from the Lenders the sum of $1,232,500.00, which loan is evidenced by a Note Secured By A Deed Of Trust dated February 19, 2004 (the "Note"), a copy of which is attached hereto as Exhibit "A". The obligation owed by Mr. Hyler to the Lenders pursuant to the Note is secured by the lien of a Deed of Trust against the residence of the debtor and his wife commonly known as 5070 Alpine Road, Portola Valley, California, which deed of trust was recorded on March 3, 2004. A copy of said Deed of Trust is attached hereto as Exhibit "B". The loan was arranged by IGL, which acted as a mortgage broker on behalf of the Lenders with regard to the transaction.

107016.doc

Michael E. Stone, Esq.
Investment Grade Loans, Inc.
September 22, 2006
Page 2


It is the position of the trustee that the loan transaction between Mr. Hyler, his wife and the Lenders was, and is, subject to the provisions of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.* and the Federal Reserve Board's Regulation Z, 12 C.F.R. Pt. 226 *et seq.* While the trustee acknowledges that you have taken the position that the loan was obtained for a business purpose, and therefore, not subject to TILA, it is the trustee's position that the loan was made primarily for personal purposes and thus subject to TILA. and Regulation Z.

Our analysis of the provisions of the Note indicates that the loan transaction violates the provisions of TILA in the following respects:

1.      The annual percentage rate on the loan of 16.0% exceeds the maximum permitted by Section 1602(aa)(A) of TILA.

2.      The total points and fees of approximately $126,250.00 paid by Mr. Hyler and his wife exceeded 8.0% of the total amount of the loan in violation of Section 1602(aa)(B) of TILA.

3.      The Note provides that in the event of a default the interest rate increases by 3.0% over the non-default rate of 16.0%, i.e., to 19.0%, in violation of Section 1639(d) of TILA.

The foregoing listing of violations is not intended to be an exclusive listing, as discovery may reveal additional violations.

Under the provisions of Section 1635(a) of TILA and 12 C.F.R. § 226.23, as a result of the foregoing violations of TILA, the trustee is entitled to rescind the loan transaction, and the trustee does hereby exercise her right to rescind the loan transaction.

Very truly yours,

GOLDBERG, STINNETT, MEYERS & DAVIS
A Professional Corporation


By

Terrance L. Stinnett

TLS:tls
Enclosures
cc:     Fletcher Hartwell Hyler, (w/encl.)
        Andrea A. Wirum, Esq., (w/encl.)
        Jenifer K. Gardella, Esq., (w/encl.)
10185

107016.doc

EXHIBIT E



MICHAEL E. STONE
ATTORNEY AT LAW

April 12, 2006

*Via Facsimile and US Mail (415) 296-7894*

Edward Simpson, Esq.
Gerald A. Holmes, Esq.
SIMPSON & GIGOUNAS
100 Pine St., Ste. 750
San Francisco, CA 94111

**Re:    In re: Fletcher H. Hyler**

Dear Mr. Simpson:

In response toy your letter of April 10, 2006, let me state that you missed the *only* legitimate argument your client might have, and that is as to post-petition default interest. While I disagree with the arguments made in your letter, and will address them below, I am aware that under the bankruptcy laws any post-petition default penalty becomes unenforceable; so to that extent, and only that, my client's statements will be recalculated.

Now, first of all, let me remind you that your client already filed a lawsuit against Investment Grade Loans and accepted a cash settlement for a release of all claims dealing with the loan(s). And he did that prior to his bankruptcy petition. Obviously, he does not get a second bite from that apple.

Next, you should do more legal research on the Truth In Lending Act, as it neither applies to "arrangers of credit" (as IGL was) nor to business loans such as Mr. Hyler made (applies to consumer transactions for personal and household purposes). And then it is a disclosure notice statute, and Mr. Hyler was given full written disclosures. Finally, the statute of limitations on TILA claims is one year, and that has long since run out (**not tolled by his bankruptcy petition**).

3425 SOUTH BASCOM AVENUE, SUITE 1
CAMPBELL, CALIFORNIA 95008
(408) 377-9899 Y FAX (408) 377-5270
EMAIL: MESTONE@PACBELL.NET

Edward Simpson, Esq.
April 12, 2006
Page 2

So, we will not be amending our claim to an unsecured claim; we will not be eliminating

any interest; and we will not be eliminating pre-petition penalties imposed in accordance with the

loan documents and disclosures signed by Mr. Hyler; the only change (and not one requiring an

amended claim) is that we will be eliminating post-petition penalties, including the extra

"default" interest.

And because of your ludicrous demand, we are no longer willing to sit back and wait for

the property to some day be sold. We will be refiling our motion for relief from stay, as it should

be abundantly clear to everybody now, including the Court, that the Trustee is not going to be

able to sell the property for enough money to cover all secured debt and the capital gains tax.

There have been zero offers in the price range necessary for the Trustee to accomplish a sale, so

now it is time for the creditors to put the property up for auction.

Very Truly Yours,

LAW OFFICE OF MICHAEL E. STONE

Michael E. Stone

MES/td
cc: Dan Linchey, attorney for Trustee
    Yoshie Valadez
    client (w/enc.)

EXHIBIT F

## COMPROMISE, SETTLEMENT AND MUTUAL

## RELEASE AGREEMENT

WHEREAS, the parties to this Compromise, Settlement and Mutual Release Agreement (hereinafter this "Agreement") are FLETCHER HARTWELL HYLER and SHERYL ROOT HYLER (hereinafter collectively referred to as "HYLER "), and INVESTMENT GRADE LOANS, INC., LINCOLN TRUST COMPANY FBO DOUG PICKERING, CHERN S. LIN, FELICIA LIN, JANICE TEMPEY, ROY S. WOLF, THOMAS C. O'CONNELL, JR., JANICE K. O'GRADY, PENSCO TRUST COMPANY AS CUSTODIAN FBO JOHN A. SNYDER IRA, PENSCO TRUST COMPANY AS CUSTODIAN FBO PHIL AHLFELDT, IRA, and JOHN STEVENS (hereinafter collectively referred to as "IGL");

WHEREAS, a dispute has arisen between HYLER and IGL with respect to certain loans IGL made to HYLER that were secured by HYLERS' personal residence, located at 5070 Alpine Road, Portola Valley, CA 94028. More specifically, on or about February 19, 2004, IGL loaned HYLER the sum of $1,232,500.00 secured with a deed of trust in 2nd position against HYLERS' personal residence. On or about March 17, 2004, IGL made an additional loan to HYLER in the sum of $100,000.00 that was secured by a deed of trust in 3rd position against title to the same property. IGL'S loans to HYLER were junior to a 1st promissory note and deed of trust in the sum of $4,205,700.00.

WHEREAS, soon after IGL made the above-described second and third loans to HYLER, a dispute arose between HYLER and IGL regarding the interest rate provisions of the loans. HYLER ceased making payments on the loans from IGL and contended that the IGL loans violate the provisions of the Truth In Lending Act, found at 15 U.S.C. Sec. 1601, et seq. (hereinafter the "the Dispute"). The foregoing facts and circumstances have resulted in HYLER filing an action that is currently pending in the United States District Court for the Northern District of California, identified as <u>HYLER v. INVESTMENT GRADE LOANS, INC.</u>, Action No. 07-CV-03180 WHA, (hereinafter "the Action") The defendants deny the validity of the claims assert in the Action or that the HYLERS have any claims whatsoever.

WHEREAS, IGL commenced proceedings to foreclose its deed of trust in 2nd position, and HYLER filed a motion for a restraining order to prevent the Trustee's Sale from being held. On August 1, 2007, HYLER'S Order to Show Cause why the Court should not issue the requested Restraining Order was heard. The Court, the Hon. William H. Alsup presided over the hearing of HYLERS' motion. The Court granted the requested restraining order subject to the HYLERs posting a bond in the sum of $835,000 on or before noon on August 15, 2007. The Court further ordered that if the full bond were not posted with the Clerk of the Court by the date ordered, IGL could proceed that day with its Trustee's Sale.   The HYLERS were further ordered to prepare and file a motion for Summary Judgment in the Action.

WHEREAS, HYLER did not post the bond as required and on August 16, 2007, IGL concluded a Trustee's Sale of HYLER'S residence. IGL was the successful bidder at the sale,

**Page 1 of 6**

and purchased the property for the amount of the unpaid balance on its note against title to the property, in the sum of $1,902,497.43. IGL claims it has expended $2.1 million to date in regard to its transactions with HYLER. IGL is now in the process of instituting eviction proceedings to remove HYLER from the property

WHEREAS, HYLER contests the validity of the foreclosure, the right of IGL to institute eviction proceedings and all other rights IGL has contended that it has in the property and /or against HYLER. .

WHEREAS, the parties wish to resolve all their disputes and agree upon a settlement of any and all matters in dispute amongst them and to cause a dismissal with prejudice of the Action;

WHEREAS, this Agreement made by the above-named parties is a full, complete and final Compromise, Settlement and Mutual Release, whereby the above-mentioned parties hereby extinguish their mutual rights and claims arising from any and all disputes and differences between them and that each has or may have against each other, in any way relating to their Dispute and the Action.

NOW THEREFORE, in consideration of the mutual covenants herein contained and in settlement of all past and present disputes, monetary or otherwise, in any way relating to their Dispute and the Action, and effective as the date of signature of ths Agreement (hereinafter "the effective date"), the parties agree as follows:

1.    Each of the above-mentioned parties, on behalf of himself/herself, his/her descendants, ancestors, dependents, heirs, executors, administrators, representatives, attorneys agents and assigns releases and absolutely and forever discharges the other party and his/her descendants, ancestors, dependents, heirs, executors, administrators, representatives, attorneys, agents and assigns from any and all rights, claims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs, expenses, liens, actions, and causes of action of every kind and nature whatsoever, whether now known or unknown, suspected or unsuspected, which they now have, own, or hold, or at any time heretofore ever had, owned, or held or could, shall or may hereafter have, own, or hold against any other party based upon or arising out of any matter, cause, fact, thing, act, or omission whatsoever occurring or existing at any time to and including the date hereof pertaining to their Dispute, the Action, and/or HYLERS' personal residence.

2.    Immediately upon signing this Agreement, HYLER, shall cause their attorney to file a dismissal of the Action, with prejudice.

3.    In consideration for the dismissal of the action,  IGL grants HYLER a 60 day option from August 21, 2007 to:

> a. purchase the property back from IGL for the sum of $2.1 million; alternatively,

      b.   have the Trustee's sale rescinded and allow HYLER to pay off IGL'S loans for the sum of $2.1 million.

4.      HYLER shall take back title to the property subject to the balance of the first mortgage and any outstanding and unpaid property taxes. In addition, the costs of the transaction, including, but not necessarily limited to recording fees, escrow fees, transfer taxes, etc., are to be split equally between the parties.

5.      As a condition precedent to the exercise of the option, HYLER shall pay a nonrefundable deposit to IGL in the sum of $200,000.00, payable in the form of an initial sum of $100,000.00 upon the effective date of this agreement and shall pay IGL an additional sum of $100,000.00 on or before the 40th day after the effective date. If the option is exercised, the said sums will be credited against the purchase price

6.      In the event HYLER fails to perform any of the terms or conditions of this agreement or fails to make any payments required by this agreement on the due date (it being agreed that there is no "grace period") for any payment, HYLER shall immediately relinquish possession of the property to IGL within ten (10) days of any failure to perform hereunder whether it be payment of one of the deposits or the full purchase price. Prior to the escrow closing, HYLER shall give IGL written notice whether or not the title is to be transferred by grant deed or rescission of the foreclosure sale and deed.

4.      Each party covenants and agrees never to commence, assist in any way, prosecute, or permit or cause to be commenced or prosecuted, any action at law, suit in equity, or any other proceeding based upon any claims, demand, cause of action, obligation, damage or liability of any nature whatsoever, whether known or unknown, suspected or unsuspected, or any claim which they may have, or claim to have, against each other and/or each of their respective agents, officers, directors, assigns, employees, heirs, legal representatives, or administrators, directly or indirectly relating to the claims released above.

5.      Except as provided for below in the enforcement provisions of this Agreement, the parties shall bear their own attorney's fees and costs associated with their Dispute and the Action.

6.      This settlement is a compromise of the above-mentioned disputed claim and shall never be treated as an admission of liability by any party hereto for any purpose.

7.      The parties hereby acknowledge the provisions of Section 1542 of the California Civil Code, which provides that:

"A general release does not extend to claims which the creditor

**Page 3 of 6**

does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

Notwithstanding the provisions of that California Civil Code section, this Compromise, Settlement and Mutual Release Agreement is intended to serve as a release of all injuries, damages, or losses to HYLER and IGL and either of their persons and property, real or personal, known or unknown, foreseen or unforeseen, patent or latent, which either may have or claim against the other arising from or related to the Dispute or Action. HYLER and IGL understand and acknowledge the significance and consequence of such specific waiver of Section 1542 and hereby assume full responsibility for any injuries, damages or losses that they may incur arising out of or in connection with any acts, dealings or relationships between them that are in any way associated with their Dispute and the Action.

8.     The parties have read and understand, and been advised by their respective attorneys (or if signed without the advice of an attorney the right to such advice is expressly and knowingly waived) to sign this Compromise, Settlement and Mutual Release Agreement and understand that it constitutes their complete and final understanding.

9.     All parties acknowledge and warrant that they have full and complete authority to sign this Agreement on behalf of the individuals or specific entities named below.

10.     All parties herein agree that they will execute and provide, at the request of any other party, any and all such other documents or other written agreements as may be reasonably necessary to effectuate the purposes of this Agreement.

11.     This Agreement may be amended at any time and from time to time, but any amendment must be in writing and signed by each person who is then a party.

12.     This Agreement shall be binding on and shall inure to the benefit of the respective successors, assignees and personal representatives of each of the parties, except to the extent of any contrary provision in this Agreement.

13.     If any term, provision, covenant or condition of this Agreement is held by a Court of competent jurisdiction to be invalid, void or unenforceable, the rest of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

14.     The parties hereby acknowledge and agree that this Agreement, and the settlement between them described in this Agreement shall be judicially enforceable, and that the Court shall retain jurisdiction over this action for purposes of enforcing its terms, as necessary.

15.     Any controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled by a single arbitrator, mutually agreeable to the parties, in an arbitration held in accordance with the rules of California Code of Civil Procedure §1280, et seq. If the parties cannot agree upon an arbitrator, the Presiding Judge of the United States District Court

for the Northern District of California in which this action is filed, on petition of a party to this Agreement, shall appoint a neutral arbitrator pursuant to California Code of Civil Procedure §1281.6. Judgment upon the award rendered by the arbitrator may be entered into by any court having jurisdiction thereof. The cost of such arbitration, including attorney's fees, shall be borne by the losing party or in such proportions as the arbitrator shall determine.

16.      This Agreement may be executed in any number of counterparts with the same effect as if all the parties hereto were to have signed the same document. All counterparts shall be construed together and shall constitute one Compromise, Settlement and Mutual Release Agreement.

17.      This Agreement contains the entire agreement of the parties relating to their rights and obligations assumed in the Agreement.  Any oral representations or modifications concerning this Agreement shall be of no force or effect unless contained in a subsequent written modification all parties have signed.

18.      This Agreement was drafted jointly by all parties and their respective counsel. Therefore, in interpretation and/or construction of this Agreement, no ambiguity shall be resolved against any party by virtue of its participation in the drafting of the Agreement.

Investment Grade Loans, Inc.


_____       By:
Fletcher Hartwell Hyler                        Andrew Lewis, President



_____
Sheryl Root Hyler                              Andrew Lewis, as Authorized Agent
                                               for Lincoln Trust Company FBO
                                               Doug Pickering, Chern S.Llin, Felicia
                                               Lin, Janice Tempey, Roy S. Wolf,
                                               Thomas C. O'Connell, Jr., Janice K.
                                               O'Grady, Pensco Trust Company As
                                               Custodian FBO John A. Snyder IRA,
                                               Pensco Trust Company As Custodian
                                               FBP Phil Ahlfeldt, IRA, and John
                                               Stevens

APPROVED AS TO FORM:

JENKINS MULLIGAN & GABRIEL L.L.P.

APPROVED AS TO FORM:

LAW OFFICE OF MICHAEL E. STONE

By: _____

    Daniel J. Mulligan, Attorney for
    Fletcher H. Hyler and Sheryl
    Root Hyler

By: _____

    Michael E. Stone, Attorney for
    Investment Grade Loans, Inc.